Our final case today is United States v. Otuel. Mr. Terpening? Yes, Your Honor. Thank you. Good to see you. Good to see you, Judge. Good to have you here. Thank you.  May it please the Court, Will Terpening for Appellant Jonathan Otuel. This case has been thoroughly briefed. With the Court's permission, I would suggest that we focus our discussion today on what I think are the two most interesting issues, the issue where the government destroyed two different types of exculpatory evidence, and then the second issue I'd like to focus on after that, with the Court's permission, is whether the District Court should have dismissed Count 3, which is the use of a firearm in furtherance of a felony, specifically the possession with intent to distribute felony that occurred on November 19th, on the basis that there was insufficient evidence that a firearm was used in furtherance of that crime. One preliminary point that I'd like to make, of course, in this case is the thinness, to point out the weakness of the evidence in general against Mr. Otuel. The conspiracy component of this case, the conspiracy count, relied entirely on testimony from two seasoned professional drug dealers who implicated Otuel, who was an indigent homeless user, who was much less sophisticated in the drug business than they were, and who was a demonstrable consumer. And then the possession with intent to distribute count relied entirely on events that occurred on November 19th at a hotel near Charlotte, mostly relying on alleged drugs that were found in a hotel room that Otuel was never in, or that there was no evidence that he was ever in other than testimony from one of the alleged co-conspirators, Mr. Boone. So to begin with the issue that the District Court should have dismissed the indictment or suppressed all evidence related to the suspected methamphetamine because the government destroyed the suspected methamphetamine and its packaging. What destroyed was all methamphetamine? Well, it destroyed all the methamphetamine that was seized at the hotel room on November 19th, and I would suggest even more importantly it destroyed the packaging that that methamphetamine came in. Okay, but the only drug they destroyed was one meth. That's correct, Judge. They destroyed approximately 500 grams of alleged methamphetamine. And they admitted they did it by mistake. Well, I think that's an important issue, Judge. They admitted that they did it intentionally, and their position was they did it because they mixed up case numbers. And Judge Cogburn agreed with them. Judge Cogburn held it? He so found that they didn't do it in bad faith. He did make that finding, Your Honor. Yes. That's correct. So you've got to get past that. I do need to get past that. I would suggest that there's – well, let me address that, Your Honor. I don't think that we need to show bad faith in this case under Youngblood and the cases interpreting it for two reasons. And this is where, with respect to – would the Court mind if I grabbed a bottle of water very quickly? I have a little bit of dry mouth. I'm sorry. Sorry about that. With respect to the methamphetamine, the government had to use the methamphetamine to prove its case. And so our interpretation – Why did they have to use it? Could they just put it on oral testimony that that's what it was? Well, they had to use at least testimony about the methamphetamine. So they didn't have any drugs. They could have had testimony that they bought and used drugs. That's correct, Your Honor. But our interpretation of the case law is that when the government has to use at least testimony about the methamphetamine to prove its possession with intent to distribute or conspiracy case, that bad faith is not a necessary element and that we simply need to show that the evidence can't be found any other way, that meth can't be available to O'Toole any other way, and that it was potentially exculpatory. And then with respect to the packaging, our position is that bad faith doesn't need to be shown because the packaging was definitely exculpatory in the sense that Mr. O'Toole's fingerprints either wouldn't have been on it or wouldn't have been on it and the fingerprints of other individuals would have been on it. In both of those situations, the packaging would have definitely been exculpatory. And in that case, we wouldn't need to show bad faith either. But I thought that when we look at whether it's potentially exculpatory or clearly exculpatory, it's the perspective of the reasonable officer we're looking from. Is that not right? I mean, from a reasonable officer's perspective, the reasonable officer doesn't know his fingerprints aren't on it. I think what the reasonable officer knows is it's going to be extremely material to the defense to be able to test the packaging and see whether fingerprints or DNA are on it. I'm just saying I'm not sure we can start from the conclusive presumption that his fingerprints are not on this packaging because a police officer wouldn't know that. I agree with that, except to the extent that I would say that the reasonable officer in that position is never going to conclusively know without conducting tests that fingerprints aren't on that packaging. And that's the problem with destroying the packaging. I understand. But under the law, doesn't that matter? I mean, as I understood it, the primary framework is if you know it's going to be exculpatory, you don't have to show bad faith. If it's potentially exculpatory, you have to show bad faith. And from the officer's perspective, if I'm up on Jeff Harris, I mean, it's maybe potentially exculpatory, but it's not knowingly exculpatory. Do you agree? Am I missing the law on that? I think to the extent that's the law, it's been questioned or criticized in cases like the Elliott case, which I read as saying that if that were the case, if that were the law, and, again, I think we can presume that law enforcement is generally not corrupt and they're generally trying to do the right thing and all of that, so I add that caveat. But if that were the law as you pose it, it would always be the case that evidence would only be ‑‑ almost always be the case that evidence would always be potentially exculpatory only. No, it would be that there's all Brady evidence. I mean, that is on its face exculpatory, and that's why if the police destroy it, it doesn't matter whether they do it in good faith or not. I mean, there's lots of evidence that is ‑‑ sadly, we have enough Brady cases to know that that kind of evidence is out there, facially exculpatory nevertheless, not turned over or destroyed, and that just seems like that's in a different bucket. Well, what I would do, again, Your Honor, is point the court to the Elliott case. I understand that it's not mandatory authority, but I find the reasoning there very persuasive. Where it says that were that the case, law enforcement could act in a corrupt manner, could destroy evidence, and we would never be able to know. We'd never be able to test it. You know, Judge King authored an opinion, U.S. v. Johnson, a couple years ago. One of the things that U.S. v. Johnson seems to focus on is the importance of developing a thorough record about what's happened with the evidence. My belief, you know, and obviously I'm not in your mind, Judge King, but the way I read that opinion is that what you're saying is that more circumstances matter than just whether in an objective sense this is black or white Brady evidence, objectively Brady evidence. And that's kind of my problem with the overall case here in general, is that as the lawyer who tried the case, looking at the particular defendant here and looking at the evidence against him, it's about the weakest I've ever seen. And that goes to the issue with destruction of evidence as well. Judge Cogburn, I think, did an excellent job conducting a very lengthy hearing on the issue of the evidence being destroyed. But never, the hearing never got to the bottom of the issue with the packaging. It never properly separated the issue, as I hope this Court will, of analyzing the methamphetamine or the alleged methamphetamine versus the importance of the packaging, which to me is far more important and an easier call. Because I do think I have to concede that the methamphetamine would merely have been potentially exculpatory. Although, again, I would take the position still not subject to the bad faith factor because it was necessary for the government's case through testimony. I think there are some cases that say that. Just let me stop you there, because maybe I've missed that. You think our law says if the evidence is necessary for the case, the bad faith doesn't apply. And your position here is that it's, I guess this is what Judge King was saying, couldn't be proved without the actual meth? So the way I read the Belcher case, and again, I want to be very clear. I've never taken the position, and I'm not taking the position, that Belcher is advocating for overturning Youngblood or anything like that. But I think its reasoning is very instructive. And the way I read the Belcher case is that what the Court is saying there is that in Youngblood, the destroyed evidence, the government didn't have to use the destroyed evidence to prove its case. It proved it in other ways. And in that situation, a bad faith exception might apply. But when the government absolutely has to use either testimony about the meth or anything connected with the meth to prove its case, then the bad faith exception wouldn't apply. And the reasoning there would be that that kind of evidence is so important that it deserves a special kind of scrutiny, a special kind of attention. But I also want to make sure the Court understands that even if we do need to prove bad faith, we think we can do it here. And the reason we think we can do it is there's Agent Rios, the case agent here. Before you give us your reason, is the standard that we review that clear error? I believe so, yes. So in terms of... You're saying Judge Cogburn clearly erred in his ruling on the bad faith issue? Yes, Your Honor. I'm saying Judge Cogburn clearly erred by ignoring the evidence of the pattern that the case agent had here of presiding over, or I should say supervising, cases where material evidence was destroyed. At the trial level, both in the briefing and in hearings, I drew the Court's attention to a case called Cabrera-Rivas, which this Court also dealt with on appeal. But in Cabrera-Rivas, Agent Rios was the supervising agent in a case where a video recording of the defendant's immediate post-arrest interview was destroyed. In that case, the destruction happened because I believe it was the Gaston County Police Department's video recording devices and storage systems were set to automatically delete evidence every seven days. And normally what would happen would be law enforcement would go in when there was evidence that was potentially exculpatory and protect it, stop the auto-deletion. There, the evidence was deleted. We made a record. We examined Agent Rios about that. His explanation was extremely thin. And then two years later, we have another situation happening, in this case where Agent Rios is involved in a situation where evidence is getting destroyed. And our belief is that that pattern, even if it's a pattern of gross recklessness, I don't think we have to accuse Agent Rios of doing anything that's necessarily corrupt, but that pattern of gross recklessness is enough to demonstrate bad faith. And again, that's something that's contemplated in the Elliott case involving the destruction of the glassware. There are other, I would suggest, indicators of bad faith, that particularly with the troubling pattern of Agent Rios and Cabrera-Rivas in here, and the aggregate point of bad faith. One is the evidence at the hearing that the government wasn't concerned enough about the destruction of the methamphetamine in packaging, in this case, to conduct an internal investigation, to take any remedial measures, to discipline Agent Rios, or to do anything at all that showed that it was troubled by what happened, other than make some offhanded remarks to Judge Cogburn. To me, that's extremely troubling, that evidence would, even according to the lead chemist who tested the drugs here, evidence would be destroyed for the first time in seven years of her testing drugs. So it's a remarkable event in her experience. And the government doesn't take any remedial measures of doing internal investigation whatsoever. And then there's the other, what I would call, red flag factor or suspicious factor, which is that shortly before trial in this case, we learned that the government intended to send Agent Rios out of the country during trial, making him unavailable to testify. And we had to attempt to attain a subpoena and raise the issue with the court to remedy that. But their position was that it would be sufficient for him to testify at the motion to suppress and that he shouldn't be required to testify at trial. And although he did ultimately- You didn't know that those two events were connected intentionally? I don't. Again, you know, Judge, it's a circumstantial thing, and the argument is sort of where there's smoke, there's fire. So we've got the pattern of Cabrera-Rivas and what happened here. We've got the failure to do any internal investigation or take remedial measures. We've got trying to send Agent Rios out of the country during the trial. We've got the, in terms of the way that this supposed error happened, we've got the issue of, my understanding is that this happened, that the testimony is that this happened because Rios didn't double-check case numbers, didn't take any kind of safeguards to double-check that the wrong evidence wasn't being destroyed. And, again, that's a sort of recklessness that I would suggest that the Elliott case points to as evidence of bad faith, as an indicator of bad faith. And so we don't think bad faith is something that we need to show, but we think if we need to show, we can show it. With my small amount of remaining time, I'd like to briefly touch upon the argument that Count 3 should have been dismissed because of the lack of evidence that a firearm was used in furtherance of the crime alleged in Count 2. Count 3 is flawed, is what you're saying? Yes, Your Honor. The proof is flawed. The proof is too weak. And the main thing I want to focus on the court there, because I have so little time, is that Count 3 isn't based on the conspiracy. It's based on the events of November 19th at the hotel. And you made a motion for judgment of acquittal, and it was denied. That's correct, Your Honor, and for a new trial. And, again, quickly, the factors would be that Mr. O'Toole was never in the hotel room with these alleged drugs and that he wouldn't need a firearm in that situation because any dealing that happened on that day occurred between Mr. O'Toole and Boone. They were each other's alleged suppliers, even according to Boone. They were friendly. They were sleeping together. They were sharing a hotel room in which they slept together. So, obviously, O'Toole trusted and felt comfortable enough around Boone that he wouldn't have felt like he needed a firearm to protect himself. So our, and we argued this extensively in the brief as well, but our position would be that the evidence was by far insufficient there. Thank you. Thank you very much, sir. We reserve some rebuttal time. Yes, thank you. Ms. Ray? May it please the Court, Amy Ray for the United States. Good to have you here, Ms. Ray. Thank you, Judge King. I sure appreciate that. I would like to begin by just providing a statement from Arizona v. Youngblood about what the standard is, but I also really want to take a minute to rebut the suggestion that there's any evidence of bad faith in this case because I don't think that Mr. Terpening accurately summarized some of that evidence, and I really want to address that on behalf of Agent Rios and our agents in this case. So, first of all, in terms of Arizona v. Youngblood, the Supreme Court said very specifically that it was unwilling to read the fundamental fairness requirement of the Due Process Clause to impose upon the police a requirement that they preserve all material that might be of conceivable evidentiary significance. They made very clear in Arizona v. Youngblood, and this Court has never said anything else, that if all it is is potentially exculpatory, then there is a requirement that the defendant show bad faith. Belcher and Elliott are both district court cases, and neither undermines the general principle, nor of course could they undermine the general principle that bad faith is required. But because Mr. O'Toole focuses on those two cases, I will just note briefly that in Elliott, the evidence that was destroyed was destroyed within hours of the crime. It was methamphetamine lab evidence, and the assertion was that it would be, that there might have been fingerprints on that evidence. And in Elliott, the Court said that they had shown bad faith because there was no way that, there was no justification or policy. But that was a district court case. I don't think it helps. In Belcher, there was a destruction of the marijuana plants. I don't think the Court got it right in Belcher that it could just ignore Arizona v. Youngblood, and not require a showing of bad faith. But that said, it was a destruction of marijuana plants before they were tested. Completely different than what happened in this case. So this Court has never suggested, and in fact, in Cabrera-Rivas itself, which Mr. Terpening and I both happen to have handled, this Court rejected the due process claim in part because there had to be a finding of bad faith, and negligence wasn't sufficient. So to address the specifics of some of what Mr. Terpening suggested about Cabrera-Rivas and Mr. Rios' conduct. In Cabrera-Rivas, there was no evidence that Agent Rios was the supervisor of Michael Vargas, who was the person that failed to preserve the evidence, because he failed to make a recording permanent before the seven days. He was the case agent, but he also said he was the undercover agent. He didn't participate in the interview. He had a co-agent. I don't think that Cabrera-Rivas in any way supports the suggestion that Agent Rios was responsible for the failure in that case. In fact, he said in testifying, and this evidence is before this Court because Mr. Terpening put this in in the district court, but Agent Rios explained, yeah, the task force officer didn't preserve the recording. But he didn't supervise the task force officer in that work. And there wasn't any evidence that he suggested that he did. Now, in this case, the suggestion that the government didn't undertake an investigation that it should have undertaken is not a fair one, in my opinion, because the government knew exactly what happened. And we've provided the emails that show that the case number was 16 digits long. It was the same sort of case number, and then you have an evidence number. And only the last five digits are different. And the case, the emails reflect that Mr. Rios was asked on the same day by the Department of Homeland Security personnel, do you want to destroy this evidence? One was evidence that was seized from Boone's home that could have been destroyed properly because he had already pleaded guilty, although frankly, I would have counseled against that. That's okay. And the other piece of evidence was the evidence that we're talking about in this case. And she sent that to Agent Rios on the same day and said, hey, can we destroy this evidence? Agent Rios sends it to Regina Pack, who was the assistant U.S. attorney at the time, and he refers to the evidence that could have been destroyed, Boone, can we destroy this? She says, well, is this Boone? He pleaded guilty. Yeah, we've confirmed that's the same. She says, okay, you can destroy that evidence. Then in August, the personnel from Department of Homeland Security on two consecutive days says, hey, I want to remind you, can we destroy this evidence? And he says yes, and he just mistakes those five digits. So we know what happened. He was asked kind of at the same time about two related evidence, like related insofar as Johnny Boone was related in both cases, and that's the name of the defendant that these investigations were conducted under. And Agent Rios absolutely, and I give him some credit for this, said from the beginning, I'm embarrassed, I haven't done this in 30 years, I'm really sorry, this was a mistake. And the government also, our assisting U.S. attorneys, got up to the court and said, we made a mistake here. So the investigation was done in the district court. The district court itself conducted the investigation of what happened in this case. And those who were responsible for the mistake, and it was a mistake, took responsibility. I don't think that any, that due process or any other requirement, or even just simple fair play requires more than that. They acknowledge the mistake, and certainly nobody, that error, by the way, harmed the government much more than it did Mr. O'Toole. Because we didn't have, that he was able to make that an issue. And even argued in closing argument, both the defense and the government said, this is a problem for the prosecution. It wasn't a problem for the defense. The chances that they were going to find, even if that plastic bag, first of all, difficult to find fingerprints on plastic. But even if it weren't, the possibility that his fingerprints weren't there would not have undermined what I must respectfully suggest is very strong evidence of guilt in this case. On every single count. We had the two co-conspirators testify to specific dates and specific quantities. We, that's all we needed. We didn't need the methamphetamine. We had it. We had it tested. Nobody disputes that it was tested. Mr. Terpening suggested that they never, that Mr. O'Toole wasn't seen in the room. Not true. Officer Chaney testified that he was coming out of the room when Officer Chaney approached. So there was testimony that he had been in the room. And your honors are familiar with the facts, so I don't think I need to review those unless your honors have any questions about that. But I just do want to say that having handled many of these cases, of course, I don't think this evidence is weak at all on any point. In terms of the gun, Johnny Boone testified that Mr. O'Toole carried a big boy all the time and it was that gun that was found right next to the motorcycle that Mr. O'Toole earlier had asked to go to. So plenty of evidence that he possessed it in further of a drug trafficking offense. Plenty of evidence tying him to that. And I think that the district court got it right on every score here and did not clearly err on the bad faith determination, which was one of credibility in any event. If your honors don't have further questions, I respectfully request that this court affirm the judgment of Judge Quattlebaum. Neither of you talked about it, but I got kind of turned around on the sentencing discussion. And so it feels like a lot of it, the core of the issue is whether the district court sufficiently found the 525 grams. So on that, let me just stop there. What's the evidence or tell me why, to the extent that's an objection. Tell me how we know the district court found that there were 525 grams in terms of the sentencing. Well, the district court overruled the drug quantity objection. So Mr. O'Toole objected to that. Had to be 500 grams to get to the offense level. I think it was 34. So the district court overruled that. So we know he found it. How did he find it? Why did he find it? Well, Johnny Boone testified that the 318 grams of methamphetamine that he was sitting in front of when the officers came into the door was methamphetamine he had earlier bought from O'Toole at his trailer. And then I understand the testimony in the record, even in sentencing about it. What I'm trying to focus on, what it seemed to me was Mr. O'Toole's questions about whether the district court had adequately explained his findings. And he complains about, or cites the reference to the jury finding on possession as maybe inconsistent with a finding or insufficient to be a finding. I'm not entirely sure. I'm trying to understand the sentencing issues a little better. Right. Okay. And I apologize if our brief didn't clear that up sufficiently. So there are sort of two issues that I think Mr. O'Toole tries to conflate a little bit, in all honesty, in terms of trying to untack the 500-gram finding. So there's a legal issue on the question of the jury's special verdict for the conspiracy count, which would trigger the 10-year mandatory minimum. Because the jury found generally that the conspiracy involved more than 50 grams, which would, but then there's a Fourth Circuit decision, I think it's Foster, I can't remember, that says it's got to be possibly foreseeable 202. The jury didn't make that finding. So as a technical matter, the mandatory minimum didn't apply to the conspiracy count. But it does apply to the substantive drug trafficking account, because the jury found in that case, in the special verdict, it was adequate. That finding really has nothing to do with the 500-gram finding. Just whether you have to have some attribution to him, and since they have it on the possession account, he's kind of saying we don't need to. Well, I think on the possession count, we got the mandatory minimum satisfied. Although Judge Coburn's sentence is above the mandatory minimum, so I don't think it really matters. And didn't say he was confined by the mandatory minimum in any way. The judge just has to find the evidence supports that there was at least 500 grams were reasonably foreseeable in the course of the conspiracy. And we do have not only the evidence of that 500 grams, but of course the other transactions. I think that Mr. O'Toole does make some assertion that the district court's finding wasn't adequate. But we recite in the brief and have the joint appendix citations in our brief where the district court absolutely looked at that question and said, yes, it's 500 grams and I'm overruling you, because there's enough there. And I'm trying to see if I have somewhere I think I have that. Let's see. Okay. Well, yeah, I put it in my brief. I think that's probably the best I can have. He did argue that the conspiracy verdict couldn't support the higher mandatory minimum. The judge doesn't really address that. And I don't think necessarily needed to. Any error on that would be harmless error anyway. He argues that the drug quantity is less than 500 grams, but it's not really clear why or how it could be less than 500 grams unless you just attack the basically saying he's not responsible for any of this, attacking the jury verdict in some ways. Some of it felt merits oriented, but I think he said there's no adoption of the PSR and there's no specific finding that there's 525 grams. Yeah. Well, okay. The judge doesn't have to make a specific, the judge finds a guideline range. And actually in the statement of reasons, I believe the judge does adopt and says that it adopted the pre-sentence report. So the statement of reasons should clarify that if there were any. But it doesn't, in overruling, a judge doesn't have to say I'm overruling your objection and I'm finding 525 grams. The objection was am I responsible for at least 500 grams and the judge overrules, that's enough in terms of guideline determination. Now, when we go to the explanation, what you normally see in explanation of sentences is where the judge is exercising its discretion. Now it's found the guideline range. And does it explain adequately the choice of sentence? That isn't an issue in this case. It's not raised in this case. And I just don't think that this court's precedent requires that a district court explain with that kind of specificity or make a more granular finding than simply no, I think you're responsible for at least 500 grams. As long as the evidence supports that finding, that's all that needs to happen. There doesn't need to be a more, there's no authority that I'm aware of that this court has held. And even to the extent there is, I mean, he does say I'm going down two levels. Oh, yeah. He may not have said, well, I'm starting at 34 because of 500, but going down. Well, in overruling the objection, he does say that. And I think that also in the statement of reasons, it should reflect that he found an initial range of 34 and 1, which was 151 to 188, I think. And then he decides to go down two levels because of the destruction of the evidence and one other factor that's escaping me now because it's the pressure of the situation. Did he plead guilty on the felon in possession, I think? Yes. Thank you, Judge Harris. Exactly right. Because he acknowledged responsibility. So he goes down to 121. And because of the mandatory minimum of 120 that would have applied to the drug trafficking count, the substantive count, he went down a month above what the law would have required that he sentence in any event. I hope that answers your question, Judge Qualibam. I just don't think there's a requirement that the judge, he did overrule the objection. And I think the statement of reasons should clarify any, maybe, if there's any ambiguity at all. But I don't think there really is fairly any ambiguity when we look at the sentencing transcript. If your honors don't have further questions, thank you very much. Thank you very much, Ms. Ray. Mr. Turping. Thank you, Judge. So as my colleague acknowledges, and I appreciate it, as long as the evidence supports the drug finding, Judge Cogburn, I don't think he didn't have to give a reason. But I think the law is that he could have explained it less rather than more. The case I would point the court to is Chavez-Mesa v. United States, 1585 U.S. 109 from 2018. And what I would suggest here is that the PSR relied entirely on the drug quantities from November 19th, not on the conspiracy to determine the 525-gram drug amount. And the undisputed, well, I guess we disputed it, but the testimony from the government's single witness on what was going on inside that room, Mr. Boone, was that there were two tranches of alleged methamphetamine. There were 207 grams that were attributed to Mr. O'Toole that I believe were found in a front of Mr. Boone, that Mr. Boone testified Mr. O'Toole had sold him. So there's 318 grams of methamphetamine that are Mr. Boone's. And again, we're not determining drug quantity based on the conspiracy. So there's 318 grams that are Mr. Boone's. And there's 207 that are Mr. O'Toole's. 207 grams is less than 500 grams, of course. And the judge never explained that disparity. And so our position would be that at minimum, Mr. O'Toole should have been sentenced at an offense level 32 instead of an offense level 34. And I get that because of the variance and the way the variance works with the mandatory minimum, the difference may only be a month. But our job is to get a correct and established precedent that's helpful in the future in a month's amount. And so I would suggest that if the court understands and agrees with the way I'm describing the two tranches of drugs inside the hotel room and reads the testimony of Boone as explaining that the 300 grams were just Boone's, that there wasn't any evidence to support the 500 grams. So with that... This may be a dumb question, but I'm not under, I'm not actually sure I do understand your argument about the two sets of evidence. The one that belonged to Boone belonged to Boone because he just bought it from your client, right? Right. And then it wasn't my client's. And then it wasn't your client's anymore. But why wouldn't it count as relevant conduct if he just sold it? I think it's disputed whether he just sold it. I think the timing on when he sold it is unclear. And again, this is why I refer the court to cases like Chavez Mesa. The issue again is Cogburn didn't explain any of that. It was never taken up. We disputed it, and it just wasn't addressed. Okay. But the question would be, was it relevant conduct for sentencing purposes? I mean, the concept of relevant conduct is so broad that it's hard to credibly say that the answer is no. I'm not even asking you for what the answer is, but that would have been the question that you would have liked to hear more from the district court. Why is this relevant? That's exactly right. Okay. Thank you. I appreciate it. Thank you very much, sir. I know you're court-appointed, and I understand you went through the trial and the appeal. Well, it's been an honor to do it, and I thank you all. Well, I'll let you know that we appreciate your work. Thank you so much. Very much. We'll come down to great counsel and adjourn court until tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, Pamela A. Harris, A. Marvin Quattlebaum Jr.